163848 Hopkins County Coal LLC v. Secretary of Labor, Mine Safety and Health Administration et al. Arguments not to exceed 15 minutes per side. Ms. Kilpatrick for the petitioner. Thank you. Good morning. I see that the counter reflects it, but I did want to reserve five minutes for rebuttal, please. May it please the court and counsel, what we have in this and said, I was fired, but I didn't engage in any protected activity, and I wasn't fired on account of any protected activity under the Mine Act. In response, MSHA launched a full-scale investigation demanding, among other things, five years of personnel files for employees who also were fired for not engaging in protected activities. What the complaint was all about? There was an investigator who testified that he did interview Mr. Gatlin before making the records request. What did that consist of? Is that in the record, what that consisted of? He did testify two years after the fact, after the request for the records to be made. But agencies are allowed to believe stuff that's testified to after the fact, right? Yes, that is correct. What happened during that? Mr. Smith testified that Mr. Gatlin, the complainant, did raise a few issues that he thought gave the investigator a suspicion of protected activity. But when Hopkins County Coal noticed that in the complaint there was no allegation of protected activity under the Mine Act and asked MSHA what their authority for demanding the personnel records was, since there was no protected activity alleged, MSHA remained mute on the subject. So your complaint is essentially that you weren't informed, or is it that there wasn't enough basis to proceed, which would be Well, I think that there was both. I mean, there was not enough basis to proceed. Well, in the complaint. In the complaint. And you think the complaint provides that. Section 105C2 of the Act says that the miner must have a belief that there was a violation under the Mine Act and he must file a And this complaint, I think without dispute, did not allege discrimination under the Mine Act. And so when Hopkins County Coal said Can you file a complaint, say I have a complaint, and then the agency comes and figures out what the content of that complaint is, that's not allowed under the regulations? I think under That the complaint has to be sufficient to state a claim under the Mine Act before there's any input from a consultant or an interviewer or a complaint taker or anything like that. Under a plain reading of 105C2, the complaint must allege discrimination under the Act. It says discrimination under the Act, though. Doesn't he say discrimination? He says that I believe that I was wrongly fired for not coming back, you know, for demanding extra pay. I mean, I don't think he I just want to see if we hold in your favor, will we be saying that all complaints have to meet certain pleading standards before anyone has received the complaint and said what's this all about? I think a complaint has to allege discrimination under the Act. You're saying yes, that's the rule we have to come up with. For purposes of the investigation, is that your view? I mean, I'm not trying to put words in your mouth, but I'm just trying to understand your argument. It seems like you're saying that the scope of the agency's investigation is basically limited to the scope of what's alleged in the complaint. I think that as a threshold matter, the complaint needs to allege discrimination under the Mine Act. There may be facts that are It's undisputed in this case that it didn't. Is that fair? I think that's correct. I mean, that seemed to be common ground in the brief. I think so. It's just a 12B6 dismissal if it were in federal court all day long. Yes. And then taking that a step further, I think that certainly when the government seeks to launch an investigation that includes a demand for records production, private business records kept in a mine office, and when the recipient of the request says, you know, can you please tell me a reasonable basis for your demand, the government has a burden to articulate a reasonable basis. Where do you get that? I get that because the Act itself says that the records must be reasonably required. So it's just reasonableness. Whether it's reasonably required seems like it might be different from how much information you give the requestee. I don't mean to interrupt, but where are the words reasonably required? I've been looking for them for a while. That's in Section 103H of the Act. So in 8, can we translate to USC numbers? That is 813, I think. Okay. 813H. Thank you. So, yes, I think it's incumbent upon the government to articulate a reasonable basis for the request in the absence of a cognizable claim under the Mine Act. You're inferring from they have to have a reasonable basis to they have to give a reasonable basis to the? Yes, that is my contention. Okay, and what do you use to support that? Well, because the government has the burden of justifying its records demands, and also if the government doesn't have to articulate a reasonable basis, then there's no way for the recipient of the demand to evaluate whether it should mount a constitutional or a statutory challenge. I don't think that the Act contemplates an investigator simply coming in and saying, I'm investigating a discrimination complaint. You have no right to know what it is, but I'm going to demand any records that at my sole discretion I deem are relevant to this unarticulated claim. Let me ask the question maybe in a different way. In your view, what limits are there on the authority of the agency to show up at your place of business and demand any file they want to demand? What limits are there? Well, that is the problem here. I mean, but under your conception of the statute, what limits are there? What should the limits be? I'm asking you what you think they are under the statute. Well, I think that the statute in the discrimination context does not really provide any specific directives or guidelines to these subordinate government agents to come in and demand records, and I think that therein lies the constitutional problem. Well, my question is statutory. I know you have a Fourth Amendment argument. I mean, I'm trying to, rather than complain about the scope of what they did here, I'm trying to get an affirmative statement from you about what you think, what limits does the statute place, circumscribe their authority to show up at your doorstep and ask for any file they want? I think that Section 103H says that the Secretary can request documents that are reasonably required to perform his functions under the Act. I don't think that that authority can be delegated to low-level administrators to determine the reasonableness. So I don't think that the Act authorizes that special investment. What did the two dissenting commissioners, just to remind me, what was their rationale? Was it that these wide-ranging requests were not reasonably required? I mean, I don't want to lead the question. What was their rationale for saying that this request was not lawful? I think that they believed that when a complaint on its face does not allege discrimination under the Mine Act, and Hopkins County Coal raised that issue, that the government had a burden to tell them what the reasonable basis was for the request. What would have happened if the complaint itself in this case had laid out some of the allegations that seemed only to surface two years later, namely that, well, they told me not to report certain safety violations and they fired me for that reason? If the complaint had said that and they come to you with the same request, what happens? I still don't think that it passes muster constitutionally, because in... I'm a little fixated on the statute. Okay, okay. What happens under the statute? Is it okay? I think the analysis has to be, is the request reasonable given the allegations in the complaint? And then I think you also have to look at the issue that says the secretary may reasonably require documents. It doesn't say that an investigator or a local district... I think a delegation argument is probably not going to get you real far here. I mean, statutes say the secretary all the time, and the secretary of labor himself is not running around doing this. Well, but the secretary can act by promulgating regulations, which then in turn will give operators knowledge that they may reasonably expect certain records to be subject to a government agent coming in and asking to see them. And so that is my understanding of the meaning the secretary may reasonably require. But, yes, I mean, I think that's part one and the reasonableness is part two, but then you still, even if it's authorized by statute, you still have to go on and do the constitutional analysis, which I don't think the secretary has justified. Thank you. May it please the Court. Philip Mayer appearing on behalf of the secretary. Your Honors, the secretary did nothing remarkable here. She made a document request for the most basic type of documents an agency would need to investigate an alleged claim of discrimination. The personnel file of the complaining minor and the personnel file of similarly situated minors. Critically, as the commission and the ALJ both found, and Judge Rogers, as you observed, the secretary did so only after MSHA special investigator interviewed the complaining minor and determined that, if true, his allegations established that he had engaged in protected activity for which he may well have been terminated. Why isn't there any conveyance of that to the employer? I mean, if you're an employer and they come with what appear to the employer to be intrusive demands, if I were the employer, I'd want to know what this was about. And you can say, well, we know what it's about, but we're not going to tell you. Just give us the stuff and you can complain later when you challenge the penalty we're going to impose on you. Well, the secretary did say in the initial letter to Hopkins that it was investigating the discrimination complaint, and I know that the complaint itself. Discrimination over what? I mean, the premise, the thing for which he's being discriminated against is never revealed to them. So as some of your questions to my friend, I think, helped illuminate that there is no statutory requirement that the secretary spell out the precise nature of the allegations that he's investigating. I don't know. I didn't really hear that being spelled out. Let me ask you a question. Is it common ground in this case that the complaint itself did not state a claim under the act? I agree that it's common ground that the complaint itself does not on its face explain the protected activity. I appreciate that straightforward answer. But there is a caveat, which is Hopkins argues in its brief that the complaint affirmatively claims that he was fired for insubordination. I don't think that's a fair reading of the complaint. I understand. I mean, and as you know, I think it's 805C2 requires the secretary promptly to forward the complaint to the operator. We'll just call him. What, in your view, is the point of that requirement? I think the point of that requirement is to put the operator on notice that the secretary has received this particular complaint and is investigating a discrimination complaint by that particular minor. You know, certainly a minor who's- But what if the complaint then doesn't even state a claim for discrimination? So if it just, you know, said I've been discriminated against? Like this complaint. Again, the requirement says to forward the complaint. But, I mean, I guess I'm trying to see the implications of that, you know? I mean, and so I guess to put it a different way, why isn't that one statutory clue here, that the investigation that follows has to- that the complaint itself has to provide some notice of the scope of the investigation that follows? Or conversely, or whatever the word would be, that the agency's authority is in some way circumscribed, the authority to investigate by what the complaint says. Two points. The first is that because the statute says precisely what the secretary is supposed to do in response to a complaint, which is to investigate as he deems reasonable. And as I started to say about the nature of this complaint, I think the complaint does at least raise some questions. It may not affirmatively state on its face an act of discrimination, but it does raise alarm bells that would concern a special investigator because you have a- Mr. Gatlin was a belt examiner, and that's a job whose- basically the job is to survey. Well, you can be insubordinate in any position. I mean, I just- I'm not seeing health and safety alarm bells in that complaint. The alarm bell- and again, I'm not claiming that it's- No, I know. I know. The alarm bell is that he is a person who's responsible for- his job is doing safety examinations of the belts inside the mine. And he says in the first sentence of the complaint that he's reading reasonably between the lines of it, that he's not having time to complete his assigned tasks. Is it your position that upon the filing of any complaint, even one that's legally frivolous under the act, the agency or the secretary or, frankly, as a practical matter, the local officials, have unlimited discretion to demand from the operator any file they want to demand? Can I ask a clarification? Yeah, absolutely. When you say legally frivolous under the act, do you mean- Yeah. Survive a 12B6 motion? Correct. I mean, like this one. I mean, it just doesn't state a claim. I don't want to be seen to concede that this is- Oh, no, no. I'm not trying to trap you at all on that. But I am seriously troubled by the implications of the agency's sort of action here as compared to the complaint and some of the arguments. And I just want to understand, I mean, is it your view that upon the filing of any complaint, even one that does not state a claim under the act, the agency has unlimited authority to show up at their doorstep and say, I want all of these files, and whatever files they say, you're kind of out of luck, unless you want to run the risk of $5,000 a day and then after the fact challenge. It's not unlimited because as Section 103H, it's 813H, says that the secretary's request must be reasonably necessary. And that's what the two commissioners focused on. It is. So maybe that's kind of the nub of the issue. And I think that the- and if that- and that is the nub of the issue. And the question is, at what time is it reasonably necessary? And, again, as I started in my opening remarks, the secretary did not simply receive this complaint and go out and start making document demands. The secretary went and interviewed the complaining minor, and there's- and Special Investigator Smith explained why we go out and interview complaining minors, even if the complaint itself isn't very clear, doesn't have- that's at Joint Appendix 218 through 19, where he testifies that previously MSHA was sort of triaging these complaints as they come in and deciding whether or not they, on their face, state a claim and not necessarily investigating them all. And there were complaints made to Congress that, as a result, because minors are not necessarily always the most sophisticated, you know, complainers- I remember in your brief. That meritorious complaints were slipping between the cracks. And so we did, in this case, what the secretary- the secretary developed a policy of at least have a follow-up conversation for every complaint. And in the course of that follow-up conversation, there were disturbing allegations made, and they didn't pan out. But if they had- I follow all that. All that makes sense. Why not let the employer in on that? So the employer knows what the reason is for the search. Not the search, but the request. That's the key here, at least when you boil it down to what the other side is arguing about. They say, yeah, you can say later that you had more on your mind, but you never told us you had more on your mind. And we don't have any basis for knowing whether we should resist this and risk thousands of dollars in fines or whether we should go along because we don't even know what we're charged with. And you do because you've had somebody go out and interview you, the agency. You know because you've had someone go out and interview the fellow, but there's no hint of a conveyance of what they found out when they went and interviewed him. Three points if I can get through. Or is that wrong? Three points if I can get through them all. The first is, as I think you observed during my friend Ms. Kilpatrick's time at the podium, there is no statutory requirement that we do so. But I know that doesn't respond to that. But we're looking at reasonableness. So second is that what Hopkins did know is that we were investigating discrimination against a particular minor. It did not know the basis upon which. But the document in demand here was really a pretty humble one in terms of what an agency needs to assess whether or not an act of discrimination has happened. His own personnel file, that is minimally burdensome. And, frankly, the citations would be sustainable just on that ground. It's the implications of what you're arguing. I mean let's say they asked for, you know, a lot more stuff. I'm not seeing any limiting principle acknowledged by the secretary here that would limit his discretion at all. The limiting principle is whether or not it's reasonably required. And then I think, Judge Rogers, this goes to the last point I wanted to make in response to you, which is I understand that part of what worries you is the specter of the penalties at the back end. Because if an operator wants to challenge and sort of put us to the test of showing whether or not it's reasonably required, they have to go through those proceedings, and I understand that concern. And that goes, and the response to that is the discretion that is baked into those proceedings. If the secretary issues a citation and if Hopkins or any operator contests, and if it's found by a judge that it was very reasonable for them to have wondered and to contest the citation, then there's really discretion all the way down. The secretary proposes penalties, but those penalties are reviewed de novo. That's easy for the agency to say. But it's a lot less easy for a private citizen or entity potentially to take advantage of and practice. I mean, when you have the Fed show up on your doorstep and potentially now you're being fined thousands of dollars a day because you're not complying with what some local official, you know, is telling you to do, that's a big risk. I mean, there is a tremendous pressure simply to capitulate. And the idea that, well, you know, some judge is going to make it all better at the end, I mean, that's not nearly the same as a Fourth Amendment warrant application or an administrative subpoena, where if you show up and it's ridiculous, go to the judge, right? And the subpoena doesn't have any compulsory effect, right, unless a judge signs off on it. So here it's just the district manager. I understand where district managers are actually pretty high-level officials. Yeah, okay. I mean, but here it's some district manager. These folks are pretty much out of luck until they get to, I guess, the Sixth Circuit. Well, I mean, until they get to the expedited proceedings before an ALJ, which happened within a year. So, I mean, we're still in the agency, you know, itself. Actually, an important clarification there. The commission and its ALJs are completely independent of the secretary. This is not an agency that is housed. And the Act does that precisely for this type of reason, and that's what the Supreme Court said in Thunder Basin, that the mine commission is a completely independent agency. The commissioners are appointed by the president. There's no responsiveness to the secretary. It's really meant to function as a court. And that's what the Supreme Court based its holding in Thunder Basin, that there wasn't. I don't know if it fixes the problem, but it's helpful to know his background. My question comes down a little bit to what I asked before. And part of your answer is, well, my question I'm asking before is, why not tell them when you find out what the basis is? You don't really know. You interview, you find out, and you don't tell the employer until two years later. Even though it was in your mind, we'll accept, I guess, the fact that it was in the mind of the interviewer when he interviewed him. He figured out that there was some problem, let's say. One answer is, well, they didn't have to. Well, yeah, but we're talking about reasonableness. Why not tell them? I don't understand that. They were objecting to this. Can't they say, this complaint upon interview appears to allege safety concerns, allege that he would report safety concerns when they didn't exist, or whatever it was that they surmised after the interview. That was my first question when you got up. Why not tell them? I understand. I can tell you what Special Investigator Smith said about why he didn't tell them, and that's at page 161 of the Joint Appendix, which is that he said that the more information you give an operator, it can tend to skew the investigation. People can tailor their responses to the nature of what you're investigating. That said, I mean, I'm not insensitive to your comment. It may have been helpful if the agency had said something just as you suggested, something upon interview that there may be protected activity here. That would have been helpful, I guess. I guess another answer, I don't know whether it makes sense, is that they did know that whatever it was, it had to do with his being fired. That's exactly right. So if they know that much, they know that this is the kind of information you're going to have if there's a question about being fired. That's what I had meant to convey in original response to your question. Let me ask another technical question. I was a little surprised in your brief that you emphasized that there were two independent bases for these requests. There's 103A and 103H, and that they're independently supporting. Is that right? I would say that they're mutually corroborating. What you say is that they're separate and each sufficient, I believe. So certainly Section 103A provides a very broad mandate and instruction for the Secretary to investigate and inspect mines. Health and safety conditions pretty much all the way through there, right? As opposed to complaints. And 105C2 complaints about discrimination are, as Congress said in the legislative history, a vital component of safety in mines, and it's not just about protecting complaining miners. It's about understanding the health and safety risks that may be being ignored because of the nature of a miner's complaint. The facts here are actually— Here's my question. Your argument, the first three words are two separate provisions. I'm taking that to be bottom line, up front. You're talking about two separate provisions, all right? Yes. Does the agency really rely on two separate provisions, or does the agency rely on the discrimination? I read the agency's decision as an interpretation of H, not as relying in the alternative on H and on A. So by the agency's decision, do you mean the commission decision? Yes. The commission decision, I believe, relies entirely on H. The Secretary throughout these proceedings— That's the decision we're reviewing, right? That's the decision you're— That's the decision that we're reviewing? That's correct, but because of what I was— That's the decision we're reviewing, and if we're giving deference to the agency, we give deference to the agency with respect to the decision that they made, right? So that actually—I see that my time has expired. Can I— You can keep going. Don't worry. That goes— I don't mean to intrude. I might— That goes to the conversation I was having with Judge Kethledge earlier about the independent nature of the commission. All of the deference cases in the Mine Act and Osh Act context talk about deference going to the Secretary's interpretation, and it's precisely because the Secretary is not the adjudicator. The commission is the adjudicator, but the Mine Act sets up the Secretary as the policymaking entity, and so that's why the Secretary throughout these proceedings has claimed A and H as bases upon which these— what kind of claims they affirmed and what kinds of claims they didn't address. You're saying because we give deference to interpretations and fact findings of the Secretary— Not to fact findings. Not to fact findings, just to interpretations. Yes, so that— But this isn't—I'm not asking whether there's an interpretation. I'm asking whether there was an application by the commission. The commission didn't rely on this provision. I'm not saying that they may have interpreted it different from the agency. They just don't rely on it. They're relying on H, and it seems to undermine your defense of H to come in and start arguing about something that they didn't even rely on. It doesn't literally undermine it, but it sure made it look suspicious to me when you say, well, we have this lower decision that you're reviewing and it's all focused on this provision. Let me start out explaining why this other provision, which they didn't rely on, supports me. I think we started with H, because certainly H is our lead argument. I think it's the most straightforward argument because of the plain text of Section 103H. The reason the Secretary made both arguments is because the Secretary has made both arguments throughout these proceedings, and we wouldn't want to be seen to have waived the 103 argument simply because it's not the one that the commission chose to rely on. Here I would point out that we cite the BHP Copper case in support of our 103A argument. That is a prior commission case that did hold that the Secretary is authorized to request information pursuant to Section 103A as well. So the fact that the commission didn't rely on that provision here, the Secretary, if we failed to raise that, could be accused of having waived that. If we rely on that, we're relying on something that the commission hasn't applied its review and expertise to. Is that a Chenery concern that you're raising? Yes. Still good law. Absolutely still good law. No quarrel with Chenery. I'm glad to hear it. Some people mutter about it. Not at all. I would say, though, that Chenery is, again, this goes to the unique nature of the relationship between the Secretary and the commission. Because the Secretary is the policymaking entity, the logic of Chenery is that a court can't rely on a basis that the agency did not rely on, because that would be intruding into the policy decisions of the agency. But all of the deference cases about the Mine Act. You don't think Chenery applies to the, I don't know what you call them, the mine board? To the mine commission. I believe that a court can affirm a decision by the commission on alternate grounds urged by the Secretary. I don't think you need to here. I don't think Chenery doesn't really apply. That's interesting. And I do believe that's consistent with the logic of Martin v. Osherick, the deference case we cite, as well as all of this court's discussion of. That's not a Chenery case. We're going to have a blue book exam after our event. Sorry. At the end of the day, though, at the end of the day, Judge Ryders, I know we've gone down this rabbit hole for a few minutes now, but you're right that 103H is certainly sufficient to sustain the commission's decision here. So if you're troubled by that, there's no need to go to A, but the Secretary didn't want to not make that argument. Can I ask a different but related, John, do you mind if I ask a question? Yes. This is not about your 103A argument. But it is, I mean, 103A does obviously provide for regular inspections by the Secretary of the mine, right? I mean, the Secretary has a duty. He requires them. But those inspections, those regular inspections, the scope of those would not include the sorts of files that are at issue in this case. Is that fair? I think that's right. So, I mean, I guess why now I just want to talk about the Fourth Amendment issue. Dewey talks about whether the mine, in Dewey they were saying the mine owner, it was a mine case, if I recall, right, knows that the mine is going to be subject to these inspections, and that sort of diminishes the Fourth Amendment protection, I guess. I mean, they know they're periodic inspections for specific purposes. And here we have inspections that are outside the scope of that. So why isn't their Fourth Amendment concern a significant one, given that there doesn't seem to be any basis in the complaint, on the face of the complaint, for the request, and it's outside of what they normally have to make available to the Secretary? Let me try to answer that question. Sorry for the kind of rambling question. Let me try to answer it at each of three levels. The first is at the level of what the Donovan v. Dewey analysis looks like. And the Secretary contends that that's basically a decision saying that the structure of the Mine Act is such that mine operators are on notice that they are subject to pervasive and regular, I mean, not just regular meaning the four times a year, but more regular than that. I mean, the Act doesn't just call for those four. But not so pervasive that it would reach these files. Not so pervasive that it would reach the Secretary searching these files, which is to say actually intruding into the mine office and rummaging through the files. I don't know how far that distinction is going to get you. I mean, you could ask for all the files. I mean, I saw that argument in your brief. I think that distinction should get us pretty far. I mean, I guess it's a constructive search versus. And the Supreme Court cases on constructive searches are very permissive. I didn't want to short circuit your answer so quickly. So that's one answer at the highest level. At the next level of generality, Section 105C2 itself establishes a regular presence by the Secretary. It says that in response to Section 105C2 claims, we're supposed to investigate them and investigate them in an extremely rapid basis, and as the Secretary deems reasonable. And the Secretary explained at JA218, as I said previously, why we interview every miner when we get a complaint. And then at the third level, this isn't a facial. Nothing, I think, in Hopkins' brief can be interpreted as some sort of facial challenge to the Secretary's procedures. And so look at what the Secretary actually did here. What the Secretary did here is really no way different from what an administrative subpoena would look like. We sent a letter that articulated the specific documents. I mean, there's a huge difference, and it really is part of the core of this case, which is an administrative subpoena, it's like the House of Representatives doing a subpoena. Who cares until a judge says somebody has to comply with it? And so, I mean, there's a world of difference. In an administrative subpoena, you'd have to go to a judge. Well, that goes to... You would have to go to... They're just off in the hills with you guys, and, you know, the fines are running. But here, as long as they contest, we have to go to a judge as well. We have to go to an administrative law judge. And in terms of the fines starting to run, as we point out in our brief... It's not quite the same as an administrative subpoena, right? An admin subpoena isn't... I mean, please, because you know this stuff better than I do. An admin law administrative subpoena, you have to go to an Article III judge. That's usually how they're structured, but there's nothing that I'm aware of that says that that must be how they're structured. Indeed, the most recent Supreme Court case on administrative subpoenas and administrative searches, the Patel case, specifically says that any sort of pre-compliance review... Or that the Supreme Court has never stated what type of pre-compliance review is necessary. Your other concern, though, aside from who the adjudicator is, I believe, is the penalties. And as to the penalties, we made the point in our brief that there's actually countless schemes that have been repeatedly affirmed by courts in which agencies make information demands that are analyzed for their Fourth Amendment sufficiency under administrative subpoena standards. So the Gurley case is this circuit's decision. And those penalties are available from the day that the recipient of the information request doesn't comply if it is subsequently determined after a court hearing that they have failed to comply unreasonably. And indeed, the Morton Salt case, which is sort of the birthplace, along with the Oklahoma Press case, of the administrative subpoena doctrine, was itself a case like that. If you go to actually the last page... I don't want to go down that particular rabbit hole since the red light's on. Just real quick, it seems to me, based on your brief, that it's the Secretary's view that the Fourth Amendment just simply doesn't apply to anything at the mine. I'm not trying to be sort of sensationalist, but that seems to be the implication. It just doesn't apply here. I know that in our earlier exchange you suggested you don't find this overly compelling, but the Secretary does acknowledge, first of all, that there are some privacy expectations in these documents, and in particular we acknowledged in our brief that especially under this circuit's precedent that we wouldn't have the right to rummage through files ourselves in an operator's office, and I think that difference matters a lot. Certainly it's much more intrusive. I guess I took enough depths in practice. I kind of like to hone in on an answer. So does the Secretary believe that the Fourth Amendment does apply to the mines? Yeah, it does apply. But it applies in the sense that the Secretary can't physically go through the files, but the Secretary could ask for all the files. And it applies because the Fourth Amendment standards that apply to administrative subpoena requests are that it be reasonable and relevant and non-duplicative of something the Secretary already has. So if we just blasted somebody with a give us every file in your mine office, I think that pretty clearly wouldn't survive that level of scrutiny. They don't have any idea on their end. This goes back to what Judge Rogers was saying. I mean, you have your own sort of rationale in mind, but they can't distinguish, and they have to make a decision that potentially exposes them to great civil liability for fines. They don't know that rationale in this case  and they can't distinguish between a demand that is targeted to some legitimate safety concern that the agency is investigating and what you just described, this blast-out thing. They have no idea. They can't tell the difference. Well, again, here they knew that we were investigating a potential act of discrimination against one particular miner and therefore able to assess whether or not the guy did. You keep saying that, but, you know, it's like discrimination based on what? They don't know. They have no idea. I understand that they don't know. I mean, the guy, you know, he could just... I don't know. I mean, this thing doesn't state a claim, so anything that doesn't state a claim, when you start going beyond that and asking for a lot of files that don't seem to be tied to any safety issue raised in the complaint, they can't tell the difference between a blast-out demand, I think was the term you used, and something that's legitimate. Just to be clear, when I said blast-out, I was referring to if we had just requested every single file in a mine. But it's hard for them. I mean, what we have to do here is not just decide this case, but potentially, as you know, lay down a rule that's going to govern other cases, and that is going to either let the agency ask for as much as it wants without explaining anything, which is going to require some correlation between what the operator is told and what the agency can ask for. But again, I would contend that the same concerns you have, which I think they're all tied eventually to the daily penalties, arise in cases like this Circuit's Gurley decision, which involved an agency request, and those requests, there simply is no statutory requirement that there be much explanation of why. Well, there's reasonably required. There's reasonably required. But there does not say that you must explain why it's reasonably required. Well, we'll see about that. Fair enough, Judge. Thank you for your answers. Appreciate it. I would like to just follow up on a few points that were discussed in the Secretary's argument. The Secretary contends that the only limiting principle is reasonableness, but that they don't have to articulate any basis for their request other than that this is a discrimination investigation. Following that contention, anytime anybody alleges discrimination, then they have carte blanche, as you alluded to, to potentially all personnel files, or for that matter, all private documents in the mine office because we can't tell you why, but it's reasonable in our investigation of this unarticulated discrimination case. Why is that? I don't understand why you assume that if it's enough to get five or ten personnel files for people who are fired for the same reason, that that means that it would be reasonable to get all the personnel files for the whole company. I mean, you just say that. Well, the problem is we don't know. You don't know what? Well, you know what's asked. What's asked is fairly limited. We know what's asked, but we don't know what's alleged. I understand that, but I'm talking about the one point you just made, which I don't follow. I understand a lot of the rest of it, but I don't see why just saying that a request for ten files means that it's reasonable means the same as a request for a million files is reasonable. I mean, any reasonable person could see some difference. Well, I think you have to look where this leads. Well, it only leads. If the court sanctions. So any time you say something's reasonable, then it's not reasonable because it might lead to something unreasonable? No, I'm saying that. I just don't follow it. That a basis upon which to judge its reasonableness needs to be articulated or it's constitutionally suspect. Well, but reasonableness is not only related to whether you have a basis for what you're doing. It also relates to the scope of what you're doing. I agree that the scope is one factor, but. So if you say this is reasonable where it's a very small scope and it's unclear what the purpose is, it might be unreasonable if neither of those was the case. That would be perfectly reasonable, wouldn't it? I think that the government has to articulate a reasonable basis. So that's your argument, is that in order to be reasonable, they have to tell you why, right? Yes, and that is particularly so where the complaint. Why is that? Why do they have to know? Why does the government have to know? No, why does the employer need to know? I mean, it sounds plausible when you think about it, but on the other hand, they say, this person's complaining about his discharge. Implicitly, but not explicitly, it might relate to some violation of the Act. We want to know more about his discharge and why you discharged people for this and how you discharged other people for this. It doesn't say we want all the records in the whole world. It just says we want to know who else was discharged for this kind of thing. So that we can look at it. You know they're looking at the discharge and the reasons for the discharge, right? I mean, anyone can figure that out. But without any articulation of it. I understand it's without articulation. I'm just saying why that's not reasonable. I'm not asking why that's not reasonable. I'm asking why do you need to know? You're saying they need to know. Why do they need to know? Because on its face, this complaint did not allege any acts of discrimination. That's saying they didn't know. But I'm saying why do they need to know in order to make a response to this fairly limited request? What good would it do for them to know? How would that enable them to decide whether to comply with it? The employer could then judge, is this investigator carrying out functions under the Mine Act? So will you have a chance to challenge it, not how to respond to it? Well, the employer needs to know that in order to evaluate, do I respond and provide these documents? Or is this a constitutionally and statutorily suspect search for records that I'm going to refuse to provide and challenge instead? I also looked in something that you asked me earlier, Judge Rogers. Didn't Gatlin allege discrimination? And if you look back at his complaint, he doesn't even allege discrimination. He says, I feel that I was unfairly terminated, and I think the comment about the union played a part in my being discharged. But the Secretary says he could simply file a complaint saying I was discriminated against under the Mine Act. He didn't even do that. I would also say that the Secretary says that there is regularity in the discrimination investigation process, but there's not. There's nothing in the Mine Act that says that all operators are subject to a regular program of discrimination investigations. As Judge Keff alluded to, this is a separate construct from the hundreds of pages of regulations that relate to mining activity and mining conditions, the reason that the mining industry is pervasively regulated. This is a separate scheme that is not controlled by specific guidelines and regulations, and that, I think, again, brings in the Fourth Amendment analysis that this demand is not an adequate substitute for a warrant or other legal process. I see that my time is up. Thank you. The case will be submitted, and I believe the other case is on the briefs so that you can adjourn the Court. This Honorable Court is now adjourned.